[857 NE2d 1114, 824 NYS2d 584]

Eric Parker, Appellant, v Mobil Oil Corporation et al., Respondents. (And Third-Party Actions.)

Argued September 5, 2006; decided October 17, 2006

## POINTS OF COUNSEL

*Kreindler & Kreindler LLP,* New York City (*Marc S. Moller* and *Blanca I. Rodriguez* of counsel), and *Baggett, McCall, Burgess, Watson & Gaughan,* Lake Charles, Louisiana (*William B. Baggett, Sr., Wells T. Watson* and *Jeffrey T. Gaughan* of counsel), for appellant. Where the causal link between benzene and leukemia is established science, and plaintiff's expert uses the generally accepted methodology of differential etiology to opine that plaintiff's 17-year exposure to benzene caused his leukemia, there is no *Frye* test novel science issue, and it is for the jury to decide whether benzene caused plaintiff's leukemia by a preponderance of the evidence, taking account of the facts surrounding plaintiff's exposure to benzene, his personal risk

factors, and the expert's testimony based on deductive clinical reasoning and scientific data. (*Stubbs v City of Rochester,* 226 NY 516; *Ruggiero v Warner-Lambert Co.,* 424 F3d 249; *Marsh v Smyth,* 12 AD3d 307; *People v Wesley,* 83 NY2d 417; *People v Wernick,* 89 NY2d 111; *People v Lee,* 96 NY2d 157; *People v Carroll,* 95 NY2d 375; *People v Angelo,* 88 NY2d 217; *People v Jeter,* 80 NY2d 818; *People v Taylor,* 75 NY2d 277.)

*Wilson, Elser, Moskowitz, Edelman & Dicker LLP,* Newark, New Jersey, and New York City (*Robert J. Kelly, Richard E. Lerner, Robert P. Scott* and *Suna Lee* of counsel), for Mobil Oil Corporation and another, respondents. I. To defeat a motion for summary judgment in a case requiring expert proof, the expert's opinion must be predicated upon reliable facts and data. (*Alvarez v Prospect Hosp.,* 68 NY2d 320; *Winegrad v New York Univ. Med. Ctr.,* 64 NY2d 851; *Amatulli v Delhi Constr. Corp.,* 77 NY2d 525; *Romano v Stanley,* 90 NY2d 444; *United States v Benson,* 941 F2d 598.) II. The Appellate Division correctly subjected plaintiff's unsworn expert reports to *Frye* scrutiny and properly deemed them insufficient to defeat defendant's motion. (*People v Wesley,* 83 NY2d 417; *Frye v United States,* 293 F 1013; *People v Wernick,* 89 NY2d 111; *Selig v Pfizer, Inc.,* 185 Misc 2d 600, 290 AD2d 319; *Hammond v Alekna Constr.,* 269 AD2d 773; *Collins v Welch,* 178 Misc 2d 107; *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 US 579; *Gallegos v Elite Model Mgt. Corp.,* 195 Misc 2d 223; *Zafran v Zafran,* 191 Misc 2d 60; *Cameron v Knapp,* 137 Misc 2d 373.) III. Plaintiff's reliance upon the "differential etiology" methodology to avoid *Frye* scrutiny is misplaced. (*Frye v United States,* 293 F 1013; *McClain v Metabolife Intl., Inc.,* 401 F3d 1233; *Bitler v A.O. Smith Corp.,* 391 F3d 1114; *Norris v Baxter Healthcare Corp.,* 397 F3d 878; *Hall v Baxter Corp.,* 947 F Supp 1387; *Stubbs v City of Rochester,* 226 NY 516; *Ruggiero v Warner-Lambert Co.,* 424 F3d 249; *Cavallo v Star Enter.,* 892 F Supp 756, 100 F3d 1150; *Sutera v Perrier Group of Am. Inc.,* 986 F Supp 655; *Whiting v Boston Edison Co.,* 891 F Supp 12.) IV. Plaintiff's reliance on the practical probability test is misplaced, since no such test exists. (*Matter of Miller v National Cabinet Co.,* 8 NY2d 277; *Dangler v Town of Whitestown,* 241 AD2d 290; *Farkas v Saary,* 191 AD2d 178; *Smith v Johnson & Johnson Co.,* 6 Misc 3d 1001[A], 2004 NY Slip Op 51670[U]; *Matter of New York City Asbestos Litig.,* 24 AD3d 375; *Hallahan v Ashland Chem. Co.,* 267 AD2d 657.)

*Smith Mazure Director Wilkins Young & Yagerman, P.C.,* New

York City (*Joel Simon* of counsel), for Island Transportation Corporation, respondent. I. The Appellate Division was correct in ruling that under *Frye v United States* (293 F 1013 [1923]), plaintiff's expert testimony was inadmissible. (*Zito v Zabarsky*, 28 AD3d 42; *Whiting v Boston Edison Co.*, 891 F Supp 12; *Sutera v Perrier Group of Am. Inc.*, 986 F Supp 655; *Berk v St. Vincent's Hosp. & Med. Ctr.*, 380 F Supp 2d 334; *Becker v National Health Prods., Inc.*, 896 F Supp 100.) II. The Appellate Division properly granted summary judgment. (*Gadman v Catalfo*, 251 AD2d 370; *Cobb v New York City Hous. Auth.*, 251 AD2d 362; *Shinn v Lefrak Org.*, 239 AD2d 335.) III. Plaintiff-appellant's argument was not raised in the lower court and is therefore not properly before this Court.

*Rivkin Radler LLP,* Uniondale (*James Quinn, Jay D. Kenigsberg* and *Harris J. Zakarin* of counsel), for Getty Petroleum Marketing, Inc., respondent. Plaintiff failed to demonstrate that the opinions of plaintiff's expert were based upon principles and procedures generally accepted in the relevant scientific community and therefore admissible under the *Frye* rule. (*Frye v United States*, 293 F 1013.)

*Locks Law Firm, PLLC*, New York City (*Seth R. Lesser* of counsel), and *Val Washington* for American Trial Lawyers Association and another, amici curiae. I. The Appellate Division erred in applying the *Frye* test to the foundational inquiry into whether a particular expert properly applied a generally accepted methodology to the facts of the case. (*Marsh v Smyth,* 12 AD3d 307; *Zito v Zabarsky,* 28 AD3d 42; *People v Wesley,* 83 NY2d 417; *Frye v United States,* 293 F 1013; *People v Brown,* 97 NY2d 500; *People v Lee,* 96 NY2d 157; *McCarthy v Handel,* 297 AD2d 444; *People v Reynolds,* 193 Misc 2d 697; *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 US 579; *Sutera v Perrier Group of Am. Inc.,* 986 F Supp 655.) II. This Court should not impose on trial judges the responsibility to act as gatekeeper to scrutinize whether an expert has properly applied a generally accepted methodology. (*Barefoot v Estelle,* 463 US 880; *In re Japanese Elec. Prods. Antitrust Litig.,* 723 F2d 238, *revd on other grounds sub nom. Matsushita Elec. Industrial Co. v Zenith Radio Corp.,* 475 US 574; *Christophersen v Allied-Signal Corp.,* 939 F2d 1106, 503 US 912; *Ferebee v Chevron Chem. Co.,* 736 F2d 1529; *In re Paoli R.R. Yard PCB Litig.,* 35 F3d 717, 513 US 1190; *Moore v Ashland Chem. Inc.,* 151 F3d 269; *Maye v Stearns,* 19 AD3d 902; *People v Middleton,* 54 NY2d 42; *Parklane Hosiery Co. v Shore,* 439 US 322; *Galloway v United States,* 319 US 372.)

*Metzer Law Group, APLC,* Long Beach, California (*Raphael Metzger* of counsel), for Council for Education and Research on Toxics and others, amici curiae. I. A worker should not be required to quantify his cumulative benzene dose, because cumulative dose has not been validated as the scientifically valid dose metric for assessing leukemogenis risk from benzene exposure, and other dose metrics may be more relevant. II. A plaintiff in a benzene leukemia case should not be required to quantify his cumulative benzene dose, because benzene monitoring is rarely done and estimating a worker's cumulative benzene dose by experimentation or modeling is either impossible or impracticable. (*Industrial Union Dept., AFL-CIO v American Petroleum Institute,* 448 US 607.) III. There is no persuasive scientific evidence that a threshold for benzene-induced leukemia exists, and substantial scientific evidence negates the existence of a threshold for benzene-induced leukemia. IV. As more and more scientific research is done, increasingly lower levels of benzene exposure are being reported to cause leukemia. V. Individual factors of susceptibility, i.e., genetic polymorphisms of susceptibility—rather than a worker's benzene dose—are the primary determinants of a worker's risk of leukemia. VI. A quantified dose is not needed to prove that benzene exposure caused a worker's leukemia; benzene induction of leukemia can often be proved by pathology, by cytogenetics, and other means.

*Mayer, Brown, Rowe & Maw,* Washington, D.C. (*Andrew J. Pincus, Charles A. Rothfeld* and *Rajesh De* of counsel), and *National Chamber Litigation Center, Inc.* (*Robin S. Conrad* and *Amar D. Sarwal* of counsel), for Chamber of Commerce of the United States of America, amicus curiae. I. When expert scientific testimony is necessary to establish the causal connection between plaintiff's alleged injury and defendant's product or conduct, the decision whether to admit or exclude such evidence is of critical importance. (*Frye v United States,* 293 F 1013; *Lara v New York City Health & Hosps. Corp.,* 305 AD2d 106; *Savage v Union Pac. R.R. Co.,* 67 F Supp 2d 1021; *In re Agent Orange Prod. Liab. Litig.,* 611 F Supp 1223; *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 US 579; *General Electric Co. v Joiner,* 522 US 136; *People v Wesley,* 83 NY2d 417; *People v Wernick,* 89 NY2d 111; *People v Angelo,* 88 NY2d 217; *People v Lee,* 96 NY2d 157.) II. This Court should affirm the Appellate Division because expert causation testimony is subject to the same standard as all other scientific evidence and is admissible only if it relies upon generally accepted principles to show a link be-

tween plaintiff's injury and defendant's product or conduct. (*Frye v United States,* 293 F 1013; *People v Wesley,* 83 NY2d 417; *Styles v General Motors Corp.,* 20 AD3d 338; *Heckstall v Pincus,* 19 AD3d 203; *Pauling v Orentreich Med. Group,* 14 AD3d 357; *Selig v Pfizer, Inc.,* 290 AD2d 319; *Zito v Zabarsky,* 28 AD3d 42; *Lewin v County of Suffolk,* 18 AD3d 621; *Del Maestro v Grecco,* 16 AD3d 364; *Saulpaugh v Krafte,* 5 AD3d 934.) III. Failure to preserve the standard for admission of expert causation testimony would subvert the fairness of the trial process, produce insupportable results, and impose significant burdens on the judicial system. (*In re Agent Orange Prod. Liab. Litig.,* 611 F Supp 1223.)

*Malaby, Carlisle & Bradley, LLC,* New York City (*Robert C. Malaby* and *David P. Schaffer* of counsel), *Crowell & Moring LLP,* Washington, D.C. (*William L. Anderson* and *Jennifer G. Knight* of counsel), and *Shook, Hardy & Bacon, LLP* (*Victor E. Schwartz* and *Mark A. Behrens* of counsel), for Coalition for Litigation Justice, Inc., amicus curiae. I. Careful scrutiny of novel tort expert evidence is a necessary part of modern tort jurisprudence under *Frye v United States* (293 F 1013 [1923]) or *Daubert v Merrell Dow Pharmaceuticals, Inc.* (509 US 579 [1993]). (*General Electric Co. v Joiner,* 522 US 136; *Bartel v John Crane, Inc.,* 316 F Supp 2d 603, *affd sub nom. Lindstrom v A-C Prod. Liab. Trust,* 424 F3d 488; *Nelson v Tennessee Gas Pipeline Co.,* 243 F3d 244.) II. A "differential diagnosis" performed by these and other experts is reviewable under *Frye v United States* (293 F 1013 [1923]). (*General Electric Co. v Joiner,* 522 US 136; *Lust By & Through Lust v Merrell Dow Pharms., Inc.,* 89 F3d 594.) III. Low-dose exposure cases require a more rigorous dose assessment than the anecdotal stories and subjective terminology applied by Drs. Landrigan and Goldstein. (*Brock v Merrell Dow Pharms., Inc.,* 874 F2d 307, 884 F2d 166; *Chambers v Exxon Corp.,* 81 F Supp 2d 661; *Allen v Pennsylvania Eng'g Corp.,* 102 F3d 194; *Hall v Baxter Healthcare Corp.,* 947 F Supp 1387; *Conde v Velsicol Chem. Corp.,* 804 F Supp 972; *Norris v Baxter Healthcare Corp.,* 397 F3d 878; *In re Breast Implant Litig.,* 11 F Supp 2d 1217; *Allison v McGhan Med. Corp.,* 184 F3d 1300; *McClain v Metabolife Intl., Inc.,* 401 F3d 1233; *Bartel v John Crane, Inc.,* 316 F Supp 2d 603; *Mitchell v Gencorp Inc.,* 165 F3d 778.)

*Michael A. Cardozo, Corporation Counsel,* New York City (*Leonard Koerner, Fay Leoussis, Christopher G. King, Amy London* and *Elizabeth S. Natrella* of counsel), for City of New York and another, amici curiae. New York State courts must exercise a

strong gatekeeping role to ensure that only expert opinion evidence on causation that is based on sound scientific principles and methodologies is admitted into evidence. In the instant case, the Appellate Division correctly determined that plaintiff did not meet his burden to show that the expert opinion was based on a scientifically reliable methodology. (*People v Wesley,* 83 NY2d 417; *Frye v United States,* 293 F 1013; *Daubert v Merrell Dow Pharmaceuticals, Inc.,* 509 US 579; *People v LeGrand,* 196 Misc 2d 179; *Buchholz v Trump 767 Fifth Ave., LLC,* 5 NY3d 1; *Diaz v New York Downtown Hosp.,* 99 NY2d 542; *Romano v Stanley,* 90 NY2d 444; *Matter of Angel A.,* 92 NY2d 430; *People v Angelo,* 88 NY2d 217; *Del Maestro v Grecco,* 16 AD3d 364.)

*Debevoise & Plimpton LLP,* New York City (*Anne E. Cohen, Robert D. Goodman* and *Genevieve A. Pope* of counsel), and *Hugh F. Young, Jr.,* Reston, Virginia, for Product Liability Advisory Council, Inc., amicus curiae. I. This Court should articulate a test for trial courts to follow when determining the admissibility of scientific expert testimony that ensures that causation evidence is reliable and genuinely scientific. (*Frye v United States,* 293 F 1013; *People v Wesley,* 83 NY2d 417; *People v Wernick,* 89 NY2d 111; *Clemente v Blumenberg,* 183 Misc 2d 923; *Saulpaugh v Krafte,* 5 AD3d 934; *Selig v Pfizer, Inc.,* 290 AD2d 319; *Matter of New York City Asbestos Litig.,* 24 AD3d 375; *Amorgianos v National R.R. Passenger Corp.,* 303 F3d 256; *In re Joint E. & S. Dist. Asbestos Litig.,* 52 F3d 1124; *Castellow v Chevron USA,* 97 F Supp 2d 780.) II. Plaintiff's radical and one-sided proposals to rewrite the law governing admissibility of expert causation evidence should be rejected. (*Saulpaugh v Krafte,* 5 AD3d 934; *Selig v Pfizer, Inc.,* 290 AD2d 319; *Hymowitz v Eli Lilly & Co.,* 73 NY2d 487; *Matter of DES Mkt. Share Litig.,* 79 NY2d 299; *Elswick v Nichols,* 144 F Supp 2d 758; *Haggerty v Upjohn Co.,* 950 F Supp 1160, 158 F3d 588; *Sutera v Perrier Group of Am. Inc.,* 986 F Supp 655; *Whiting v Boston Edison Co.,* 891 F Supp 12; *Black v Food Lion, Inc.,* 171 F3d 308; *Glastetter v Novartis Pharms. Corp.,* 107 F Supp 2d 1015, 252 F3d 986.)

*Jordan and Moses,* Saint Simons Island, Georgia (*Randall A. Jordan* and *Mary Helen Moses* of counsel), *Louis P. Warchot,* Washington, D.C., and *Daniel Saphire* for Association of American Railroads, amicus curiae. The Court should affirm the Appellate Division's holding that a plaintiff is required to prove dose by reliable scientific evidence. (*Mancuso v Consolidated Edison Co. of N.Y., Inc.,* 56 F Supp 2d 391; *O'Conner v Com-*

*monwealth Edison Co.,* 807 F Supp 1376, 13 F3d 1090; *Claar v Burlington N. R.R. Co.,* 29 F3d 499; *Kernan v American Dredging Co.,* 355 US 426; *Wills v Amerada Hess Corp.,* 379 F3d 32; *Whiting v Boston Edison Co.,* 891 F Supp 12; *Sutera v Perrier Group of Am. Inc.,* 986 F Supp 655; *Castellow v Chevron USA,* 97 F Supp 2d 780; *Mitchell v Gencorp, Inc.,* 165 F3d 778; *Wright v Willamette Indus., Inc.,* 91 F3d 1105.)

*National Legal Scholars Law Firm, P.C.,* Lyme, New Hampshire (*Anthony Z. Roisman* of counsel), for Margaret A. Berger and others, amici curiae. I. The Appellate Division committed reversible error by misapplying the existing New York State *Frye/Wesley* standard for the admissibility of expert evidence and by impermissibly adopting the federal *Daubert* standard, which it also misapplied. (*People v Forte,* 279 NY 204; *Frye v United States,* 293 F 1013; *People v Wesley,* 83 NY2d 417; *Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395; *LeChase Data/Telecom Servs., LLC v Goebert,* 6 NY3d 281; *Speller v Sears, Roebuck & Co.,* 100 NY2d 38; *In re Joint E. & S. Dist. Asbestos Litig.,* 52 F3d 1124; *Atkins v Virginia,* 536 US 304; *Amorgianos v National R.R. Passenger Corp.,* 303 F3d 256; *Marmo v IBP, Inc.,* 360 F Supp 2d 1019.) II. The Appellate Division erred in granting summary judgment because it weighed the evidence and failed to give the appropriate deference to the substantial evidence offered by plaintiff. (*Diaz v New York Downtown Hosp.,* 99 NY2d 542; *Reeves v Sanderson Plumbing Products, Inc.,* 530 US 133; *Forrest v Jewish Guild for the Blind,* 3 NY3d 295; *LeChase Data/Telecom Servs., LLC v Goebert,* 6 NY3d 281; *Speller v Sears, Roebuck & Co.,* 100 NY2d 38; *Buchholz v Trump 767 Fifth Ave., LLC,* 5 NY3d 1; *David v County of Suffolk,* 1 NY3d 525.) III. Alternatively, the Appellate Division impermissibly granted summary judgment without allowing Eric Parker to fully complete discovery and present his experts' full reports. (*JMD Holding Corp. v Congress Fin. Corp.,* 4 NY3d 373.) IV. This Court should retain the *Frye/Wesley* standard for admissibility, and reject the invitation to adopt the federal *Daubert* standard, because (a) adopting a precise exposure measurement requirement would unacceptably exacerbate the risk that toxic exposure victims will be denied access to the courts and thereby be deprived of the opportunity to obtain compensation for their injuries, (b) courts are ill-equipped to engage in the detailed scientific analyses that *Daubert v Merrell Dow Pharmaceuticals, Inc.* (509 US 579 [1993]) requires and (c) New York courts are too overburdened by rising caseloads and too limited in their resources to adopt *Daubert* and absorb the burgeoning

burdens and costs that accompany the inevitably proliferating *Daubert* motions and *Daubert* hearings. (*Zito v Zabarsky*, 28 AD3d 42; *People v Campbell*, 97 NY2d 532; *Ferebee v Chevron Chem. Co.*, 736 F2d 1529, 469 US 1062; *Daubert v Merrell Dow Pharms., Inc.*, 43 F3d 1311; *Cortes-Irizarry v Corporacion Insular De Seguros*, 111 F3d 184; *Padillas v Stork-Gamco, Inc.*, 186 F3d 412.)

### OPINION OF THE COURT

CIPARICK, J.

Plaintiff Eric Parker commenced this action in 1999 against Mobil Oil Corporation, Island Transportation Corporation and Getty Petroleum Marketing, Inc., alleging that exposure to benzene in gasoline caused him to develop acute myelogenous leukemia (AML). Parker had worked as a gas station attendant for 17 years and had been exposed to benzene through inhalation of gasoline fumes and through dermal contact with gasoline. There is no dispute that benzene is a known carcinogen.

Parker worked at several full-service stations between March 1981 and August 1998. As part of his duties, he pumped gasoline for customers, exposing him to gasoline vapors; the pumps were not fitted with vapor recovery systems to reduce exposure to fumes until the early 1990s. He was also exposed to fumes upon receipt of deliveries of gasoline and upon daily gauging of gasoline levels in the tanks and he was responsible for cleaning up gasoline spills, occasioning it to remain on his hands and clothing throughout the day. Defendants did not warn him of the dangers of benzene exposure or provide him with safety or protective gear. It should be noted that Parker was also exposed to therapeutic radiation.

Prior to the completion of discovery, and before the exchange of expert reports, defendant Mobil Oil and several third-party defendants moved to preclude Parker's expert testimony on the issue of medical causation. Defendants argued that the expert testimony was scientifically unreliable and should be excluded under *Frye v United States* (293 F 1013 [DC Cir 1923]). Further, defendants moved for summary judgment dismissing all claims, arguing that they lacked the necessary support in the absence of appropriate causation evidence.

In support of the motion, defendants introduced the opinions of two experts prepared for other litigations. The first, Dr. Gerhard K. Raabe—an epidemiologist and Director of Medical Information Health Risk Assessment for Mobil—acknowledged

that there is an increased risk of AML for service station employees exposed to large amounts of benzene ("typically over 100 PPM TWA"[1]) over an extended period of time, but concluded that the low levels of benzene exposure resulting from gasoline service station work are "below the practical threshold for the dose necessary to initiate the leukemia process." Raabe cited to a National Institute for Occupational Safety and Health (NIOSH) study of benzene exposure for service station employees (the maximum concentration of benzene in gasoline was 2% with the greatest level of exposure 0.19 ppm TWA, which is less than the 1 ppm occupational standard set by the Occupational Safety and Health Administration [OSHA]); to a study of petroleum workers exposed to gasoline with a concentration of 2% to 3% benzene that did not show any additional risk of AML from exposure to gasoline; and to a European study of service station workers exposed to gasoline that was 3% to 5% benzene that did not find an elevated risk of AML. Defendants also provided a letter from Raabe responding to an expert opinion in another litigation citing a study he coauthored, which found an increased risk of AML for those exposed to "increasing cumulative doses of benzene above 200 ppm-years . . . [and] no excess risk for AML for doses below" that level.

Defendants also offered the affidavit of Richard D. Irons, Ph.D., a toxicologist—likewise prepared for other litigation. Irons explained that the dose-related relationship was a unifying concept in the medical sciences and a cornerstone of pharmacology and toxicology; that there is usually a threshold below which no effect can be observed; and that the evidence of an association between chronic exposure to benzene and AML became less reliable as the dosage decreased; and that there was "virtually no reliable evidence to indicate that a causal relationship exists between chronic exposure to benzene at 10 ppm or lower and the development of AML." In order to determine causation, according to Irons, it is necessary to know the amount of benzene sufficient to cause AML and the amount of benzene to which the particular plaintiff was exposed. He noted that the plaintiff's expert in that case did not quantify the benzene exposure and did not address studies finding no increased risk

---

1. PPM means parts per million—here, 100 parts benzene per one million parts of air. The TWA, or time-weighted average, is the average amount of a substance to which an individual is exposed over an eight-hour work shift. This measurement can also be expressed in ppm-years.

of AML in service station or petroleum distribution workers. Irons also pointed out that AML has been known to develop in those who have been exposed to the drugs and chemicals used in chemotherapy.

In opposition to defendants' motion, Parker argued that whether benzene can cause AML is not novel scientific evidence subject to *Frye* review, and that there is a difference of opinion in the scientific community as to what level of benzene exposure causes leukemia. To support his arguments, he produced reports from two experts. Philip J. Landrigan, M.D., a board-certified physician in occupational medicine and fellow of the American College of Epidemiology, detailed Parker's medical history as well as his exposure to benzene as a component of gasoline. Landrigan noted that Parker had received radiation treatment for a prior illness. The doctor also observed that, during his service station employment, Parker frequently had cuts or abrasions on his hands that would have increased the absorption of benzene directly into his bloodstream. Further, there was at least one instance where Parker was doused with gasoline but continued to work in his gasoline-saturated clothing for the remainder of the day.

Landrigan cited several studies that linked benzene exposure to leukemia. He noted that a NIOSH study of rubber plant workers in Ohio found a relationship between increasing cumulative benzene exposure and leukemia mortality. He concluded that the study showed a risk of mortality from leukemia of about "150 times above background" over a 40-year working lifetime from exposure to benzene at 10 ppm. At 5 ppm, the risk was 12 times over background and at 1 ppm (or 40 ppm-years) the risk was doubled. The expert went on to explain that "[e]xtensive mathematical modeling was conducted to determine the shape of this positive dose-response relationship. These analyses found that a linear model best explained the association. No evidence was found for a threshold level below which no leukemia occurs."

Landrigan further noted several studies that found an increased risk of leukemia in petroleum refinery workers and pointed out that the studies that did not find an increased risk of leukemia considered all refinery workers rather than specifically addressing only those exposed to benzene. He also stated that, in recognition of the carcinogenic nature of benzene, OSHA lowered the previous workplace standard from 10 ppm to 1 ppm. Landrigan found it unlikely that Parker would have

contracted AML without his specific occupational exposure to benzene and therefore concluded "to a reasonable degree of medical certainty that Mr. Parker contracted his [AML] as a result of his personal occupational exposure to benzene."

Parker also submitted a two-page report from Bernard D. Goldstein, M.D., an expert in toxicology and epidemiology. Dr. Goldstein stated that Parker had greater levels of exposure to benzene than the workers in the refinery studies, as modern refineries function within the 1 ppm workplace standard and "[g]asoline has been approximately 2% benzene (i.e., 20,000 ppm)." He also noted that although a study of British refinery workers found no increased risk of leukemia, a "nested case-control study . . . [found] more than a doubling in the likelihood that those who did die of leukemia had been exposed to higher levels of benzene than appropriate controls." Finally, he observed that there was evidence that Parker's medical history—having received radiation treatment—made him more susceptible to leukemia from exposure to benzene. While Goldstein did give a number in ppm of how much benzene is in gasoline, neither of Parker's experts quantified Parker's exposure to benzene from gasoline.

Without conducting a *Frye* hearing (which neither party had requested), Supreme Court denied defendants' motion to preclude Parker's expert testimony. The court identified the issue as whether the causal relationship between benzene in gasoline and AML has general acceptance in the scientific community—particularly whether the experts used generally accepted principles and methodologies in arriving at their conclusions. The court recognized that Parker's experts did not cite to studies linking AML to exposure to benzene in gasoline or quantify Parker's exposure, but concluded that the experts distinguished the studies finding no increased risk of leukemia and that, while the failure to quantify exposure might require a hearing in some cases where there was less exposure, it was not necessary here.

Finally, the court determined that plaintiff's experts followed generally accepted principles and methodologies by detailing Parker's exposure, demonstrating the link between benzene and leukemia and presenting a dose-response relationship of 40 ppm-years (or the theory that there is no threshold of exposure under which there will be no negative effects to health). The court also found that Landrigan "track[ed]" the process of generating an opinion on causation in toxic tort cases recom-

mended by the World Health Organization (WHO) and National Academy of Sciences (NAS).[2]

The Appellate Division reversed and dismissed the complaint, framing the issue as "to what extent the plaintiff was required to establish the precise level of his exposure to benzene in order to establish that his AML was caused by it through a scientifically-reliable methodology" (16 AD3d 648, 651 [2005]). The Court noted that neither of Parker's experts quantified his exposure to benzene—in particular, neither provided a time-weighted average in parts per million. Even if the experts had established a threshold, they could not show that Parker's exposure exceeded it, and any conclusions as to the amount of Parker's exposure or whether the exposure caused his AML were therefore speculative.

The Court also rejected Landrigan's position that there is no threshold below which leukemia would not occur as "the scientific reliability of th[at] methodology has flatly been rejected as merely a hypothesis" (16 AD3d at 653). The Court noted that the experts did not use the three-step process approved by the WHO/NAS and that although they used studies demonstrating a link between benzene and AML, they did not prove the causal connection between the exposure to benzene *in gasoline*. We now affirm.

## Discussion

At issue in this case is the admissibility of Parker's experts' opinions. The parties dispute whether the opinions should be analyzed under *Frye*. The introduction of novel scientific evidence calls for a determination of its reliability. Thus, the *Frye* test asks "whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally" (*People v Wesley*, 83 NY2d 417, 422 [1994]; *see also People v Wernick*, 89 NY2d 111, 115-116 [1996]). *Frye* holds that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduc-

---

**2.** Those steps are: (1) determining the plaintiff's exposure to the particular toxin; (2) general causation, which is proof that the toxin in question can in fact cause the illness, and the amount of exposure required to cause the illness (the dose-response relationship); and (3) specific causation—meaning the likelihood that plaintiff's illness was caused by the toxin, including eliminating other potential causes of the disease (*see Mancuso v Consolidated Edison Co. of N.Y., Inc.*, 56 F Supp 2d 391, 399 [SD NY 1999]).

tion is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs" (*Frye*, 293 F at 1014).[3] It "emphasizes 'counting scientists' votes, rather than on verifying the soundness of a scientific conclusion'" (*Wesley*, 83 NY2d at 439 [citation omitted] [Kaye, Ch. J., concurring]).

The *Frye* inquiry is separate and distinct from the admissibility question applied to all evidence—whether there is a proper foundation—to determine whether the accepted methods were appropriately employed in a particular case (*Wesley*, 83 NY2d at 429). "The focus moves from the general reliability concerns of *Frye* to the specific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial" (*Wesley*, 83 NY2d at 429).

█ Here, there is a question as to whether the methodologies employed by Parker's experts lead to a reliable result—specifically, whether they provided a reliable causation opinion without using a dose-response relationship and without quantifying Parker's exposure. There is no particular novel methodology at issue for which the Court needs to determine whether there is general acceptance. Thus, the inquiry here is more akin to whether there is an appropriate foundation for the experts' opinions, rather than whether the opinions are admissible under *Frye*.

As with any other type of expert evidence, we recognize the danger in allowing unreliable or speculative information (or "junk science") to go before the jury with the weight of an impressively credentialed expert behind it. But, it is similarly inappropriate to set an insurmountable standard that would effectively deprive toxic tort plaintiffs of their day in court. It is necessary to find a balance between these two extremes.

One problem with establishing causation in toxic tort cases is that, often, a plaintiff's exposure to a toxin will be difficult or impossible to quantify by pinpointing an exact numerical value. Here, for example, defendants did not monitor the level of benzene in the air at the service stations. Nor were they

---

**3.** Although some amici urge the Court to adopt the federal standard (or some portions of it) as expressed in *Daubert v Merrell Dow Pharmaceuticals, Inc.* (509 US 579, 589-590 [1993] [requiring that scientific testimony be relevant and reliable in order to assist the trier of fact under Federal Rules of Evidence rule 702]), the parties make no such argument and acknowledge that *Frye* is the current standard in New York.

required to do so by law or regulation. Further complicating the process of arriving at a specific quantification in this case is that a significant portion of Parker's benzene exposure was through dermal contact—a factor that would not be addressed in the air-based ppm-years standard.

■ It is well-established that an opinion on causation should set forth a plaintiff's exposure to a toxin, that the toxin is capable of causing the particular illness (general causation) and that plaintiff was exposed to sufficient levels of the toxin to cause the illness (specific causation) (*see e.g. McClain v Metabolife Intl., Inc.*, 401 F3d 1233, 1241 [11th Cir 2005]; *Wright v Willamette Indus., Inc.*, 91 F3d 1105, 1106 [8th Cir 1996]). Where we depart from the Appellate Division is that we find it is not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship, provided that whatever methods an expert uses to establish causation are generally accepted in the scientific community.

The argument that precise quantification is not necessary finds support in case law from other jurisdictions. For example, the Fourth Circuit has noted that

> "while precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation" (*Westberry v Gislaved Gummi AB*, 178 F3d 257, 264 [4th Cir 1999]; *see also Heller v Shaw Indus., Inc.*, 167 F3d 146, 157 [3d Cir 1999]; *Hardyman v Norfolk & W. Ry. Co.*, 243 F3d 255, 265-266 [6th Cir 2001]).[4]

Some cases requiring an expert to establish the dosage at which a substance is toxic and the amount of exposure a plaintiff actually experienced also appear to recognize that an exact number may not be necessary (*see Wright*, 91 F3d at 1107 ["We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's

---

4. We recognize that these cases employ a *Daubert* analysis. However, they are instructive to the extent that they address the reliability of an expert's methodology.

emission has probably caused a particular plaintiff the kind of harm of which he or she complains"]; *McClain*, 401 F3d at 1241 n 6).

There could be several other ways an expert might demonstrate causation. For instance, amici note that the intensity of exposure to benzene may be more important than a cumulative dose for determining the risk of developing leukemia. Moreover, exposure can be estimated through the use of mathematical modeling by taking a plaintiff's work history into account to estimate the exposure to a toxin. It is also possible that more qualitative means could be used to express a plaintiff's exposure. Comparison to the exposure levels of subjects of other studies could be helpful provided that the expert made a specific comparison sufficient to show how the plaintiff's exposure level related to those of the other subjects. These, along with others, could be potentially acceptable ways to demonstrate causation if they were found to be generally accepted as reliable in the scientific community.

Turning to the opinions offered by Parker's experts, although we reject the Appellate Division's requirement that the amount of exposure need be quantified exactly, we nonetheless conclude that the Appellate Division properly precluded them and properly deemed them insufficient to defeat summary judgment. The experts, although undoubtedly highly qualified in their respective fields, failed to demonstrate that exposure to benzene as a component of gasoline caused Parker's AML. Dr. Goldstein's general, subjective and conclusory assertion—based on Parker's deposition testimony—that Parker had "far more exposure to benzene than did the refinery workers in the epidemiological studies" is plainly insufficient to establish causation. It neither states the level of the refinery workers' exposure, nor specifies how Parker's exposure exceeded it, thus lacking in epidemiologic evidence to support the claim.

Dr. Landrigan's submissions were likewise insufficient. He reported that Parker was "frequently" exposed to "excessive" amounts of gasoline and had "extensive exposures . . . in both liquid and vapor form," which—even given that an expert is not required to pinpoint exposure with complete precision—cannot be characterized as a scientific expression of Parker's exposure level. Moreover, Landrigan concentrates on the relationship between exposure to benzene and the risk of developing AML—an association that is not in dispute. Key to this litigation is the relationship, if any, between exposure to *gasoline* containing

benzene as a component and AML. Landrigan fails to make this connection perhaps because, as defendants claim, no significant association has been found between gasoline exposure and AML. Plaintiff's experts were unable to identify a single epidemiologic study finding an increased risk of AML as a result of exposure to gasoline. In addition, standards promulgated by regulatory agencies as protective measures are inadequate to demonstrate legal causation. Thus, the experts' opinions were properly excluded.

Parker's remaining contentions are without merit.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Chief Judge KAYE and Judges ROSENBLATT, GRAFFEO, READ and R.S. SMITH concur; Judge PIGOTT taking no part.

Order affirmed, with costs.