Dyer v Amchem Prods. Inc. (2022 NY Slip Op 04609)

Dyer v Amchem Prods. Inc.

2022 NY Slip Op 04609

Decided on July 19, 2022

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: July 19, 2022

Before: Gische, J.P., Mazzarelli, Oing, González, JJ. 

Index No. 190039/17 Appeal No. 13739 Case No. 2020-03086 

[*1]Kenneth J. Dyer, as Administrator for the Estate of Kenneth C. Dyer, Plaintiff-Respondent,
v
Amchem Products Inc. et al., Defendants, American Biltrite Inc., Defendant-Appellant.

Manning Gross + Massenburg, LLP, New York (Justin A. Reinhardt of counsel), for appellant.
Weitz & Luxenberg, P.C., New York (Alani Golanski of counsel), for respondent.

Order, Supreme Court, New York County (Manuel J. Mendez, J.), entered on or about December 3, 2019, which denied defendant American Biltrite Inc.'s motion for summary judgment dismissing the complaint and all cross claims as against it, unanimously reversed, on the law, without costs, and the motion granted. The Clerk is directed to enter judgment accordingly.
Defendant American Biltrite, Inc. (ABI), seeks summary judgment on the issue of causation in this asbestos exposure litigation. For reasons more fully discussed herein, we hold that ABI made out a prima facie case that during his lifetime, plaintiff was not exposed to sufficient quantities of respirable asbestos from ABI's product to cause his particular lung cancer. More particularly, ABI established that any respirable asbestos emitted when its product was cut, scored or manipulated was not enough to raise the risk of contracting lung cancer beyond the existing risk of contracting the disease in the general environment. In opposition plaintiff failed to raise an issue of fact whether the quantities of respirable asbestos that were emitted by ABI's product or that he ingested due to his exposure were sufficient to cause lung cancer.
ABI is the manufacturer of Amtico, asbestos-containing vinyl floor tiles. Plaintiff's decedent, Kenneth C. Dyer, who died from lung cancer in 2019, claimed that his disease was, in part, caused by his exposure to asbestos while employed as a salesperson in the flooring industry between 1967 and 1992. He claimed that when he cut, manipulated, and broke vinyl floor tiles to demonstrate their use to customers, the tiles emitted respirable asbestos-containing dust.
As relevant here, ABI had the burden to tender sufficient evidence to demonstrate the absence of any material issues of fact as to causation (Matter of New York City Asbestosis Litig., 33 NY3d 20, 25-26 [2019]). Once this burden was met, it would fall to plaintiff to produce evidentiary proof, in admissible form, establishing that there were disputed material issues of fact (Alvarez v Prospect Hospital, 68 NY2d 320, 324 [1986]). ABI could not meet its prima facie burden by merely pointing to gaps or deficits in plaintiff's case (Koulermos v A.O. Smith Water Prods., 137 AD3d 575 [1st Dept 2016]). Thus, ABI could not simply argue that plaintiff could not affirmatively prove causation, but rather it had to affirmatively prove, as a matter of law, that there was no causation.
Parker v Mobil Oil Corp. (7 NY3d 434, 448 [2006]) is the leading case on causation in the context of toxic tort litigation. In Nemeth v. Brenntag N. Am., (_NY3d_, 2022 NY Slip Op 02769 [2022]), the Court of Appeals elaborated upon the application of Parker to asbestos exposure cases. Parker requires that an expert opinion on causation set forth "a plaintiff's exposure to a toxin, that the toxin is capable of causing a particular illness (general causation) and that plaintiff was exposed to sufficient levels of the toxin to cause [*2]the illness (specific causation)" (Parker, 7 NY3d at 448). In Nemeth, the Court of Appeals, while recognizing its conclusion in Parker that precise quantification of exposure to a toxin is not always required, stated that causation nonetheless requires plaintiff to provide proof of "sufficient exposure to a substance to cause the claimed adverse health effect" (Nemeth, 2022 Slip Op 02769 at *1, quoting Cornell v 360 W. 51st St. Realty, LLC, 22 NY3d 762, 784 [2014]). This proof must come from expert testimony that relies on generally accepted principles and methodologies (id.). The Court of Appeals has also held that even where an expert opinion is based on reliable principles and methods, it may be excluded "if there is too great an analytical gap between the data and the opinion proffered" (Nemeth at *1, quoting Cornell, 22 NY3d at 781). The sufficiency of an expert opinion on causation in toxic tort litigation may be determined as a matter of law (Nemeth at *3).[FN1]
ABI argues that there is neither general nor specific causation to support plaintiff's claim. Because plaintiff's claim is viable only if there is both general and specific causation, ABI need only establish that one or the other is lacking to succeed on its motion.
There seems to be no real dispute that exposure to friable asbestos can cause lung cancer. There also appears to be no dispute that asbestos fibers in vinyl tiles are tightly bound in a matrix and that fibers primarily become airborne only when those tiles are scored, cut or otherwise manipulated. Relying on a simulation study conducted by Environmental Profiles, Inc. in 2007 (2007 EPI study), ABI argues that the cutting, scoring and/or disruption of Amtico floor tile does not produce sufficient airborne asbestos beyond ambient or background asbestos already present in the environment to cause lung cancer. Using the same study, and based on the decedent's deposition testimony, ABI's experts calculated that the lifetime exposure to respirable asbestos from vinyl tile was not sufficient to cause his lung cancer.
The 2007 EPI study was conducted by John W. Spencer, a certified industrial hygienist. It involved a worker and a helper who cut, scored/snapped Amtico tiles in an isolation test chamber, simulating an eight-hour "shift." Air sample cassettes were attached to the worker and the helper in each of their breathing zones. The fibers collected at the conclusion of the eight-hour study were reportedly less than 0.00044 f/cc (fibers per cubic centimeter). Based upon the results of the 2007 EPI study and their review of other materials, publications and decedent's deposition, ABI's experts concluded that the decedent's time weighted average exposure to chrysotile asbestos was below the OSHA eight-hour permissible exposure limit (PEL) of 0.1 f/cc, and also indistinguishable from 0.00000033 f/cc the lifetime cumulative exposure that the general public is exposed to in the ambient air that we all breathe.
The 2007 EPI study [*3]establishes ABI's prima facie case as to specific causation. The data collected in the 2007 EPI study shows that the levels of respirable asbestos emitted from the vinyl tiles did not exceed ambient levels. Consequently, ABI's experts concluded that whatever asbestos the decedent was exposed to from ABI's products during his lifetime did not elevate the risk of his contracting lung cancer above the general risk of contracting the disease from the environment. We find that this conclusion is supported by the data ABI provided and is sufficient to satisfy ABI's prima facie burden.[FN2]
Plaintiff argues that ABI failed to make out a prima facie case for summary judgment because the 2007 EPI study is inadmissible as a matter of law. We disagree. In Nemeth, the Court held that the simulation study proffered by the plaintiff at trial was insufficient as a matter of law because it did not account for respirable asbestos fibers.[FN3] The Court of Appeals did not hold that simulation studies are per se inadmissible. In fact, the Court suggested that had a different test model been used by the plaintiff, it might have provided a permissible simulation of the exposure alleged (Nemeth at*2). What Nemeth requires, however, is that in asbestos cases, exposure simulation studies must account for the amount of respirable asbestos fibers released from the toxic product (Nemeth at *2). Simply quantifying the magnitudes of asbestos fibers released into the environment is insufficient. The methodology employed in the 2007 EPI study provides for the placement of the air cassettes specifically designed to capture asbestos fibers created by the simulated activity in the breathable zones of the participating worker and helper. This model satisfies the requirements of Nemeth. We also reject plaintiff's argument that there was no showing by defendant that the principles and methodologies used in the 2007 EPI study were generally accepted in the relevant scientific community.
Plaintiff otherwise failed to identify an issue of fact as to specific causation. Plaintiff's primary expert, Dr. Mark Ellis Ginsburg, MD, relied on medical journals, various scientific data and guidelines set by the Environmental Protection Agency and National Institute for Occupational for Safety and Health. He also relied on simulation studies performed by Materials Analytical Services, Inc. (MAS). One study, Scoring and Snapping Asbestos Containing Floor Tile Work Practice Study (June 2002), which involved the scoring, snapping and cutting of vinyl tile, showed airborne asbestos concentrations as high as 0.26 f/cc when vinyl floor tile was installed and even higher (0.27 f/cc) when vinyl floor tile was disrupted by being cut, sanded or snapped. Another MAS study relied on by Dr. Ginsburg, Repacking of Asbestos Containing Floor Tile: A Work Practice Study (May 2004), showed an average airborne asbestos exposure of 0.96 f/cc when floor tile was dropped and repacked. These simulation studies, like the 2007 [*4]EPI study, provide a methodology intended to capture and count respirable airborne asbestos fibers within a person's breathable zone. The data from these studies supports plaintiff's expert's conclusion that asbestos fiber concentrations during repacking and other disruption of the vinyl floor tile were higher than ambient levels.
Dr. Ginsburg generally concludes that "[t]here is no safe minimum level of exposure to asbestos with respect to lung cancer" and that "manipulation of asbestos containing floor tiles can result in release of asbestos fibers into the workers' environment that are exponentially greater than the ambient level of exposure." He also states that the asbestos process releases "visible dust" and that such dust is "certainly in dangerous concentration." However, Nemeth holds that such broad pronouncements and conclusions will not satisfy a plaintiff's causation burden, which is to show the levels of asbestos that the plaintiff was exposed to and that the levels are known to cause lung cancer (Nemeth at *3). Likewise, to the extent Dr. Ginsberg's conclusions are based upon the presence of visible dust emanating from an asbestos-containing product, this theory fails to satisfy a plaintiff's burden on causation in asbestos cases (Nemeth at *2 n 3 [rejecting this approach, set forth in Lustenring v AC&S, Inc., 13 AD3d 69 (1st Dept 2004), as "incorrect"]).
The dispute based upon the competing simulation studies about whether the decedent was exposed to asbestos in an amount that exceeded ambient levels typically found in non-occupational settings is not enough to avoid summary judgment. Nemeth holds that simply showing that exposures to a toxin were "'excessive'" or "'far more'" a certain threshold (ambient) is not enough (Nemeth at *1). As pronounced by Nemeth, plaintiff had the "'difficult, if not impossible,'" task of establishing that his decedent had a sufficient exposure to asbestos to have caused his lung cancer (Nemeth at *1, *3). Dr. Ginsburg does not provide any reliable correlation between the presence of asbestos fiber concentrations found in the studies and how much in haled asbestos would have caused lung cancer generally and the decedent's lung cancer in particular. We do not know how much higher than the ambient levels the toxin concentration needs to be to trigger disease. Dr. Ginsburg's reliance on a joint compound study as a comparable to prove causation is also insufficient. Regardless of the conclusions reached in that study, it is not comparable, because the respirable asbestos samples relied upon were as high as 59.0 f/cc, which far exceeds what plaintiff proved the decedent was exposed to (Nemeth at *2 ["comparisons should be specific enough to show plaintiff's exposure level to those of other subjects"]). Under these circumstances, plaintiff has failed to raise a factual issue as to specific causation under the standard set forth in Parker and Nemeth.
In view of the foregoing, we need not reach the other issues [*5]raised by defendant.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: July 19, 2022

Footnotes

Footnote 1: In Nemeth, after a jury returned a verdict for the plaintiff, the Court of Appeals reversed, because the plaintiff's expert, as a matter of law, did not establish causation. The Nemeth Court grounded its conclusion on legal sufficiency, and not weight of the evidence (Nemeth at *1).

Footnote 2: ABI's other evidence as to causation, however, is insufficient to support its prima facie burden. The fact that the decedent was never diagnosed with asbestosis does not establish that his lung cancer was not caused by exposure to asbestos, but was caused solely by smoking. There is a body of scientific studies, some of which are referenced by ABI's own experts, supporting a conclusion that asbestosis is not a necessary predicate diagnosis for asbestos-caused lung cancer. There is additional scientific literature that smoking and asbestos exposure are additive factors, increasing the risk of lung cancer when both factors are present.
ABI's reliance on the "safety" levels established by the Occupational Safety and Health Administration fares no better. In Parker and then again in Nemeth, the Court of Appeals rejected the use of OSHA regulations as setting a safety threshold for causation purposes (Nemeth at *2).

Footnote 3: Although the expert in Nemeth testified that it placed filters inside a glove box to simulate "'breathing zones'" the Court of Appeals rejected the expert's characterization of the test (Nemeth at *1). The methodology in Nemeth differed from the simulation studies relied upon by both defendant and plaintiff in this case. Here, in each of the simulation studies proffered by each side, test participants were placed into an isolation chamber and air-collecting cassettes were placed on their bodies near their breathing zones.