OPINION OF THE COURT
Peter H. Moulton, J.
In this asbestos personal injury action, plaintiff claims that his decedent contracted mesothelioma because of exposure to talc manufactured by defendant Colgate-Palmolive Company.
Colgate moves for summary judgment dismissing plaintiffs’ complaint and any cross claims against it. Defendant asserts that the motion should be granted because (1) plaintiffs’ action is untimely under CPLR 214-c (2); (2) plaintiffs failed to exclude other potential causes of deceased plaintiff Arlene Feinberg’s mesothelioma; (3) plaintiffs failed to prove that Cashmere Bouquet talcum powder (which Colgate asserts was safe and asbestos-free) caused her to develop mesothelioma; and (4) there is no evidence of general or specific causation.
In opposition, plaintiffs assert that defendant failed to prove that the action was time-barred because Mrs. Feinberg’s symptoms were too isolated or inconsequential to trigger the statute of limitations prior to February 28, 2008. Plaintiffs further assert that in asbestos actions, a plaintiff does not bear the burden on summary judgment to exclude other potential causes of a plaintiff’s illness. Rather, Colgate has the burden of proof on summary judgment to demonstrate that Cashmere Bouquet could not have caused Mrs. Feinberg to develop meso-thelioma and it failed to do so. Plaintiffs also proffer evidence to demonstrate that Cashmere Bouquet was not safe. Plaintiffs further argue that Justice Shulman already decided the causation issue by decision and order dated January 8, 2016. In any event, they assert that because Mrs. Feinberg was exposed to visible dust produced from asbestos-containing talc, plaintiffs’ experts can and will present a scientific expression of exposure sufficient to support causation. In reply, Colgate reiterates its thoroughly briefed and well-argued positions, yet omits any response to plaintiffs’ argument that Justice Shulman’s January 2016 decision forecloses defendant’s attempt to argue causation in this motion.
I. The Statute of Limitations
A. The Law
CPLR 214-c was enacted in 1986 (L 1986, ch 682) to ameliorate the effect of a line of cases holding that toxic tort *582 claims accrued upon the impact or exposure to a substance, even though the resulting injury did not manifest itself until some time later (see Suffolk County Water Auth. v Dow Chem. Co., 121 AD3d 50 [2014]; Matter of New York County DES Litig., 89 NY2d 506 [1997]). It was enacted to rectify the injustice caused by “an archaic rule which commences the three year time period for suit on the date that an exposure occurs” (Governor’s Approval Mem, Bill Jacket, L 1986, ch 682 at 20, 1986 NY Legis Ann at 288). Prior to the enactment of CPLR 214-c, a cause of action accrued when the plaintiff was first injured or exposed (see Snyder v Town Insulation, 81 NY2d 429, 432-433 [1993]), even though the ill effects of such exposure were not manifested until years later (see Matter of New York County DES Litig., 89 NY2d at 513-514).[1]
CPLR 214-c provides for a three-year limitations period for actions to recover damages for injuries to person or property “caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property” (CPLR 214-c [2]). That period is “computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier” (id.). For the purposes of CPLR 214-c, discovery occurs when “the injured party discovers the primary condition on which the claim is based” (MRI Broadway Rental v United States Min. Prods. Co., 92 NY2d 421, 429 [1998], quoting Matter of New York County DES Litig., 89 NY2d at 509).
However, the precise timing of “discovery of the injury” or “discovery of the primary condition” is often difficult to ascertain. In Matter of New York County DES Litig. (89 NY2d 506 [1997], supra) (hereafter Wetherill), the Court of Appeals held that plaintiff’s action was time-barred where she “unquestionably knew about the medical condition forming the basis of her claim more than three years before the commencement of her 1992 action” and rejected her argument that discovery is not complete until she discerns both the bodily symptoms and *583 the symptoms’ nonbiological cause (id. at 511). Wetherill rejected plaintiff’s interpretation of CPLR 214-c (2) because CPLR 214-c (4) (which is not. argued here) is a specific provision addressing the situation where a plaintiff has discernible bodily symptoms, but the toxic etiology of those symptoms has not yet been discovered (id. at 512). Moreover, in enacting a new discovery rule for the commencement of toxic torts, the Court stated that “the Legislature had in mind only the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced” (id. at 514). Thus, Wetherill held that an “understanding of the etiology of their conditions” is not required, nor is CPLR 214-c (2) dependant “on such fortuitous circumstances as the medical sophistication of the individual plaintiff and the diagnostic acuity of his or her chosen physician” (id. at 515).[2]
Although it is clear that CPLR 214-c (3) runs from the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced, Wetherill articulated that this moment in time may be difficult to delineate. The Court stated that
“[w]e recognize that there may be situations in which the claimant may experience early symptoms that are too isolated or inconsequential to trigger the running of the Statute of Limitations under CPLR 214-c (2). We need not decide in this case, however, precisely where the threshold lies, since there is no doubt that by 1988 this plaintiff was formally diagnosed as having a combination of serious reproductive abnormalities, the very abnormalities that constitute the harm for which she seeks recovery. Under these facts, we need hold only that a ‘discovery of the injury’ occurs within the meaning of CPLR 214-c (2) when the plaintiff is diagnosed with the primary condition for which damages are sought.” (Id. at 514 n 4.)
*584 “[A]y, there’s the rub.”[3] In Wetherill, it was clear that plaintiff’s action was time-barred because “it is undisputed that the primary conditions that form the basis of plaintiff’s claim — her dysplasia, her miscarriages, her misshapen uterus, and her incompetent cervix — were all known to her by 1988” (id. at 514). Plaintiff in Wetherill learned in a March 1988 telephone call with her sister that her sister believed that their mother took DES, yet the plaintiff did not pursue the matter with her mother and did not bring a lawsuit until August 14, 1992 (id. at 509). Additionally, the Court noted that the
“consequences of in útero exposure to DES, as well as the most commonly experienced physical manifestations of such exposure, have been well publicized in the past 20 years and there is, thus, considerable public awareness that conditions such as dysplasia misshapen uterus and cervical abnormalities could signal a DES-related injury” (id. at 515 n 5).
Further
“whatever plaintiff’s own level of knowledge was, plaintiff’s sister was aware of the existence of a DES risk . . . awareness of matters concerning public health is often spread unevenly throughout the population, depending on such variables as an individual’s interest in current events and his or her exposure to news media” (id.).
Thus, the Court did not decide the very difficult question of “precisely where the threshold lies” because it was presented with a straightforward case (id. at 514 n 4). Nor did the Court elaborate on the factors which should be considered in determining whether a plaintiff experiences “early symptoms that are too isolated or inconsequential to trigger the running of the Statute of Limitations under CPLR 214-c (2)” (id. ).[4]
To determine the exacting question of precisely where the threshold lies, the First Department looks to whether a *585 plaintiff sought regular medical treatment; whether a plaintiff is limited in physical activity or misses time from work; and whether a plaintiff files a workers’ compensation claim (see e.g. Ward v Lincoln Elec. Co., 116 AD3d 558 [1st Dept 2014] [symptoms of pulmonary fibrosis were not too isolated or inconsequential to trigger the commencement of statute of limitations in the latter half of 2008 where plaintiff testified that he had persistent, severe, progressively worsening symptoms that limited his physical activity for which he sought regular medical treatment as far back as at least 2007, which by 2008 necessitated an invasive procedure that confirmed a diagnosis of pulmonary fibrosis, and where those dates were corroborated by plaintiff’s workers’ compensation claim]; Cabrera v Picker Intl., 2 AD3d 308, 308-309 [1st Dept 2003] [symptoms of chronic obstructive pulmonary disease were too isolated or inconsequential to trigger the commencement of the statute of limitations in Sept. 1992 where plaintiff exhibited shortness of breath and intermittent coughs after her exposure to chemical fumes before Sept. 1992, but where “her physical activities were not affected, she did not miss work until February 1993 . . . she did not stop working until July 1993 and she did not file a workers’ compensation claim until August 1993”]; O’Halloran v 345 Park Co., 251 AD2d 260 [1st Dept 1998] [symptoms were too isolated or inconsequential to trigger the commencement of the statute of limitations in 1990 where plaintiff exhibited some symptoms after her exposure to paint fumes in 1990, but where plaintiff only missed 2V2 days of work, and neither sought medical attention nor filed a workers’ compensation claim until after the subsequent 1991 exposure]).
Similarly, the Third Department and Fourth Department look to these factors[5] (see e.g. Malone v Court W. Developers, Inc., 139 AD3d 1154 [3d Dept 2016] [symptoms of allergy and asthma in a mold contamination action were too intermittent or inconsequential to trigger the commencement of the statute of limitations in the spring and summer of 2002 where plaintiff testified that his skin and eye irritation and throat tightness ceased when he left his office, and where plaintiff did not seek medical treatment, miss work or file a workers’ compensation claim until late Oct. 2002]; Castiglione v E.A. Morse & Co., Inc., 22 AD3d 934 [3d Dept 2005] [symptoms of chronic obstructive pulmonary disease were too isolated or inconsequential to *586 trigger the commencement of the statute of limitations where plaintiff did not miss any time from work, file a workers’ compensation claim, submit an injury report or otherwise indicate that she was aware or should have been aware that she was suffering from symptoms of chronic obstructive pulmonary disease prior to July 1999]; Scheidel v A.C. & S., Inc., 258 AD2d 751, 753 [3d Dept 1999] [symptoms of asbestosis were not too isolated or inconsequential to trigger the commencement of the statute of limitations prior to May 12, 1994 because they amounted to “multiple manifestations of his condition or injury which affected virtually all physical activity and prompted him to change the nature of his employment” where the 55-year-old plaintiff experienced shortness of breath and difficulty walking any distance in 1990, where he ceased working as a construction laborer and accepted employment as a salesperson in 1991, where he was not able to keep up with friends on a hunting trip in 1993 and where he could not lift items weighing over 20 pounds and was compelled to wear a mask while mowing the lawn during this time]; Johnson v Exxon Corp., 258 AD2d 946 [4th Dept 1999] [symptoms were too isolated or inconsequential to trigger the commencement of the statute of limitations prior to July 21, 1989 even though from early 1987 on, plaintiff experienced occasional ailments from working with chemicals, but was always able to return to work and where it was not until Nov. 17, 1989 that she was overcome by fumes, suffered body tremors, felt intoxicated, nauseous, shooting pains in her head and body rashes, rendering her unable to return to work or tolerate the scent of perfumes and tobacco smoke]).
B. Defendant’s Evidence
Defendant argues that Mrs. Feinberg began experiencing the symptoms of her pleural mesothelioma prior to February 28, 2008 and that plaintiffs’ own expert acknowledged that Mrs. Feinberg’s doctors detected the most significant manifestation of her illness in late 2007: a tumor later diagnosed as mesothelioma. Defendant points to Mrs. Feinberg’s February 2005 CT scan which was recommended because of her chest pain (but defendant does not note that the radiologist indicated that Mrs. Feinberg had a history of pulmonary embolism). It points out that the scan revealed pleural thickening and effusion (but omits noting that the report described the effusion as “minimal”). Defendant points to *587 Mrs. Feinberg’s doctor visit on December 19, 2005 for left flank pleuritic pain (but omits noting that on the same day, Mrs. Feinberg told both Dr. Gross and Dr. Baum that she had an upper respiratory infection and was coughing phlegm and had a sore throat). Defendant points out that Dr. Gross noted that the effusion was still present and that Mrs. Feinberg stated she was not exposed to fumes, gases, dust or asbestos. Colgate notes that the diagnosis was probable pneumonia. Defendant cites to Mrs. Feinberg’s January 14, 2006 CT scan where pleural effusion was again noted in the left lung (but does not note that the effusion was described as “small”). Defendant cites to Mrs. Feinberg’s visit in September 2006 prompted by chest pain. The scan again showed pleural effusion and interstitial fibrosis (which can be caused by asbestos) but Colgate fails to mention that the report described the effusion as “small” and “tiny” and the thickening as “mild” as well as the diagnosis that Mrs. Feinberg had an enlarged heart or “cardiomegaly”). Defendant points to a November 28, 2007 visit where a CT scan showed the effusion (but again fails to mention that the effusion was described as “small” and “without significant change”), thickening (but omits the description of “mild”) and the presence of fibrosis. Defendant highlights that the scan also showed a new nodule of pleural thickening measuring approximately two centimeters. Three years later, defendant notes that in October 2010 a CT scan confirmed the presence of a lesion on the pleura and multiple nodules in the left pleural space, which led to a biopsy and finding that the lesion was malignant. Defendant notes that a diagnosis was made of metastatic well-differentiated adeno-carcinoma of the ovary and a second opinion diagnosis of me-sothelioma.
In addition to this evidence, Colgate cites Dr. James Strauchen’s response to defense counsel’s question regarding whether the late 2007 nodule was a malignant mesothelioma. Dr. Strauchen stated that “[i]n retrospect that was a manifestation of malignant mesothelioma, yes” (exhibit 16, Apr. 4, 2012 tr at 91). Defendant also points to Dr. David Sugarbaker’s testimony that he would have recommended a biopsy of the nodule, and to his 1997 article indicating that chest pain and shortness of breath are the most common symptoms of mesothe-lioma. Defendant notes that both doctors confirmed that *588 pleuritic pain, shortness of breath and pleural effusions are symptoms of mesothelioma.[6]
C. Plaintiffs’ Evidence
Plaintiffs argue that Mrs. Feinberg’s symptoms were too isolated or inconsequential to put her on notice that something was wrong before February 28, 2008. Mrs. Feinberg testified that “I had some pleural effusions through the years, but it was always treated and gotten over quickly” (May 25, 2011 tr at 139). They note that she testified that she became sick “maybe a year before” her 2010 mesothelioma diagnosis (June 2, 2011 tr at 33). Mrs. Feinberg felt sick then because she could not lay on her left side and- was losing weight {id. at 34). Plaintiffs assert that it was not until October 2010 that Mrs. Feinberg complained of weight loss to Dr. Marcoux (exhibit 10, Mar. 20, 2012 tr at 22-23; see also report of Dr. Jacqueline Moline dated July 15, 2011 at 2). Before October 2010, Dr. Marcoux testified “that she may have had some minor, less severe complaints of shortness with exertion” (exhibit 10, Mar. 20, 2012 tr at 23-24). Plaintiffs also point to the testimony of Mrs. Feinberg’s treating surgeon (Dr. Sugarbaker) explaining that most people with shortness of breath, weight loss and chest pain do not have mesothelioma (exhibit 12, Mar. 26, 2012 tr at 76). Additionally, they highlight the fact that Mrs. Feinberg’s doctors previously attributed Mrs. Feinberg’s symptoms to other causes such as pneumonia or cardiomegaly.
*589 Further, plaintiffs cast doubt on the existence of a malignant tumor in late 2007. Dr. Marcoux, Mrs. Feinberg’s thoracic oncologist testified, “[s]o I can’t say her mesothelioma was present in 2007. I think that the process — there was a process going on in the pleura that progressed over that time that could have been, you know, a nonmalignant process. And then there was a malignant transformation at some point” (exhibit 10, Mar. 20, 2012 tr at 98). He stated, “I think, in my opinion, that it’s sometimes difficult to know, you know, when something went from a premalignant process to a malignant process” (id. at 100). “I can’t give you any evidence that it was present at that time” (id. at 101). Plaintiffs further point to Dr. Gary Kuehl’s testimony that he looked at the 2008 CT scan a week before his March 2012 deposition and stated “the lesion was not there” (exhibit 13, Mar. 2, 2012 tr at 25). In addition to Dr. Marcoux and Dr. Kuehl’s testimony, plaintiffs argue that there is a lack of evidence that Mrs. Feinberg was sick prior to February 28, 2008. They point to the lack of explanation for a three-year gap in treatment and symptoms between Mrs. Feinberg’s late 2007 scan and the 2010 diagnosis.
Moreover, plaintiffs contend that given the known statistic that the average survival time for mesothelioma is less than one year, an issue of fact exists as to whether prior to February 28, 2008, Mrs. Feinberg was only experiencing early symptoms which were too isolated or inconsequential to trigger the statute of limitations. They further assert that the fact that Dr. Strauchen stated in retrospect that the tumor was cancerous is not dispositive on the issue of what was known, or should have been known, at the time.
D. Discussion
The issue of whether Mrs. Feinberg’s symptoms were early symptoms which were too isolated or inconsequential for her to have discovered the injury before February 28, 2008 must be decided by the jury. The evidence does not permit me to decide the issue as a matter of law. While Mrs. Feinberg experienced many of the symptoms that one would experience with mesothelioma, those symptoms may have been attributable to other causes (like pneumonia or cardiomegaly). Therefore, there is an issue of fact as to whether the pain and effusion that she experienced prior to February 28, 2008 were in fact symptoms of malignant mesothelioma or, whether the symptoms related to another illness.
Additionally, even assuming that the symptoms were attributable to mesothelioma, there is an issue of fact as to *590 whether they were early symptoms which were too isolated or inconsequential to trigger the statute of limitations. While the CT scans reflected pleural thickening and effusion, the reports describe the conditions as minimal, small, tiny, mild and/or without significant change. Additionally, Mrs. Feinberg testified that although she had pleural effusions, she got over them quickly. Mrs. Feinberg further testified that she was not feeling well sometime between 2009 and 2010 or 2011 when she lost 40 pounds. The evidence reflects that it was not until October 2010 that Mrs. Feinberg complained of weight loss to Dr. Marcoux. Before October 2010, Dr. Marcoux testified that Mrs. Feinberg may have had some minor, less severe complaints of shortness with exertion.
Additionally, issues of fact are raised because, prior to February 28, 2008, there is no evidence that Mrs. Feinberg’s physical activity was limited (in fact the evidence is to the contrary), no evidence that she missed time from work through 2007 or filed a workers’ compensation claim, and there is no evidence that she ceased working in 2008 (when she was 76) because of her health (see e.g. Cabrera v Picker Intl., 2 AD3d 308 [2003], supra; O’Halloran v 345 Park Co., 251 AD2d 260 [1998], supra). Defense counsel questioned Mrs. Feinberg about her level of activity before she became ill with mesothelioma (which she placed in 2009, at the earliest). Mrs. Feinberg answered “yes” to defense counsel’s question about whether she was “still going to the beach a couple of years ago” and “yes” to his question whether she was “still bike riding” (June 2, 2011 tr at 38). Mrs. Feinberg’s social security records reflect that she earned annually $54,166.71 at Gift of Life in 2004, and $45,000 annually from 2005 through 2007 (exhibit 26, Abensohn aft). Mrs. Feinberg also testified that when she was employed at Gift of Life, she “traveled a lot” (May 24, 2011 tr at 164).
Most importantly, Dr. Marcoux testified that mesothelioma has a premalignant to a malignant process, and that it is difficult to pinpoint when the malignant transformation occurs. The difficulty in pinpointing the transformation is evident by the fact that Mrs. Feinberg did not pass away until January 2014. While Mrs. Feinberg may be one of the exceptions to the short statistical life expectancy for malignant mesothe-lioma of less than one year, Colgate’s position is that Mrs. Feinberg lived over six years with this disease. While a jury *591 may find this to be true, it is also reasonable to assume that the progression of mesothelioma in a person who outlives the statistical life expectancy is slower than the disease’s progression in a person who dies within a year. Therefore, assuming that her symptoms prior to February 28, 2008 are attributable to malignant mesothelioma, a jury may find that those symptoms were early symptoms in a slow progressing disease. Additionally, issues of fact are raised by the gap in symptoms and treatment between late 2007 biopsy and the diagnosis in 2010. The fact that Dr. Strauchen believed that in retrospect the nodule was a manifestation of malignant mesothelioma is not dispositive as to what Mrs. Feinberg knew or should have known at that time. Furthermore, Dr. Kuehl testified that the lesion (which was found malignant) was not present on the 2008 CT scan. Thus, the jury must determine “precisely where the threshold lies” under the unique facts of this case.
II. Exclusion of Other Causes of Injury
Defendant makes a novel argument, which the court has not yet encountered in New York City asbestos litigation. Defendant contends that because plaintiffs have not tested any bottles of Cashmere Bouquet used by Mrs. Feinberg, there is no direct evidence of a product defect. Citing Fourth Department case law, defendant asserts that “[a] product defect cannot be proven by circumstantial evidence unless the plaintiff excludes all other potential causes of her injury” (Nichols v Agway, Inc., 280 AD2d 889, 890 [4th Dept 2001]). Thus, defendant maintains that summary judgment should be granted because plaintiff has not excluded other potential asbestos exposures (dust from ceiling tiles, smoke from her husband’s Kent cigarettes, and radiation from a waste dump in West Orange, NJ where Mrs. Feinberg lived).
Plaintiffs counter that this is not the standard for asbestos cases. Plaintiffs point out that an asbestos verdict may be based on circumstantial evidence regarding product testing. Because no defense expert opines that alternate causes of me-sothelioma were a substantial contributing factor to Mrs. Feinberg’s mesothelioma, plaintiffs maintain that defendant is engaging in impermissible speculation. Even if there was another cause of asbestos exposure, plaintiffs assert that they *592 will prove that Mrs. Feinberg’s exposure to Cashmere Bouquet is nevertheless a substantial factor in causing her mesothe-lioma. Moreover, plaintiffs’ expert Sean Fitzgerald will testify that Cashmere Bouquet contained asbestos based on his review of three mines, Dr. Strauchen will testify that Cashmere Bouquet caused Mrs. Feinberg’s mesothelioma, and Dr. Moline will confirm that the mesothelioma was the result of asbestos exposure.
Colgate’s argument is unpersuasive because even in non-asbestos cases, it is not a plaintiff’s burden on summary judgment to exclude other potential causes of injury. Colgate correctly notes that “[i]n order to proceed in the absence of evidence identifying a specific flaw, a plaintiff must prove that the product did not perform as intended and exclude all other causes for the product’s failure that are not attributable to defendants” (see Ramos v Howard Indus., Inc., 10 NY3d 218, 223 [2008] [citations omitted]). However, where a defendant moves for summary judgment on this basis, it is defendant’s burden to establish a prima facie case before a plaintiff must raise an issue of fact (id.).[7] In Ramos, defendant was entitled to summary judgment because it demonstrated that its transformers were designed and manufactured under state-of-the-art conditions, were in compliance with industry standards, were individually tested prior to leaving its facility, and its expert opined that other possible causes of the explosion existed and that it was virtually impossible for a faulty transformer to leave defendant’s plant. Here, Colgate does not even attempt to meet its burden of proof, incorrectly contending that it is plaintiffs’ burden. The mere facts that Mrs. Feinberg was exposed to tiles, secondhand smoke from her husband, and lived near a waste dump do not establish Colgate’s entitlement to summary judgment.
III. Burden of Proof on Causation
Defendant asserts that even if plaintiffs could demonstrate that Mrs. Feinberg was exposed to asbestos from Cashmere Bouquet talcum powder, there is no evidence that such exposure was a substantial factor in causing her disease. *593 Plaintiffs cannot meet their burden, Colgate argues, because its product is safe. Defendant submits that cosmetic talcum powder has been used safely by countless individuals for centuries. Defendant asserts that in the early 1970s Dr. Fred Pooley detected no asbestos in 50 samples from Val Chisone/ Val Germanasca, Italian mines which Colgate used exclusively until 1968, and non-exclusively thereafter. Defendant cites a 1991 peer-reviewed study by Alice Blount which found no asbestos in talc from the area. Colgate also cites an October 2013 study by Dr. Mickey Gunter, its geology expert, finding no asbestos in talc samples from Val Chisone/Val Germanasca. Colgate also cites to Giovanni Rubino’s 1976 and 1979 studies of miners and millers who worked at least one year between 1921 and 1950, in which no cases of mesothelioma were found. Defendant cites to Maurizio Coggiola’s 2003 study of miners and millers who worked at least one year between 1945 and 1995, in which no cases of mesothelioma were found.
Colgate began to obtain talc from North Carolina mines in 1968 and Montana mines in 1970, and asserts that talc from those locations was similarly safe. Defendant cites a 1977 National Institute for Occupational Safety study finding four samples from a Montana mine asbestos-free. Additionally, Colgate points to Dr. Blount’s 1983 study finding no asbestos present in talc sourced from a Montana mine and her 1991 study also concluding that talc from mines in both states was asbestos-free. Moreover, defendant asserts that the FDA has concluded that cosmetic talc does not present a risk. Colgate cites the FDA’s 1974 study of three samples of Cashmere Bouquet, a 1976 study of two samples of Cashmere Bouquet, and a 2012 study of cosmetic talc samples, all which found no presence of asbestos.
Plaintiffs counter that there is ample evidence of asbestos contamination in defendant’s product. The FDA acknowledged in a letter that cosmetic talc produced in the 1960s and 1970s contained asbestiform materials. Johns-Mansville Corporation tested Cashmere Bouquet in 1968 and found tremolite. Plaintiffs cite the testimony of Keith Lehman, who worked for the talc processing company hired to process Colgate’s talc. His tests found talc samples were contaminated with asbestos (exhibit 26, Sept. 8, 2011 tr at 25, 57, 74, 144-145; exhibit 27, Sept. 23, 2011 tr at 488-490). Plaintiffs assert that their expert Sean Fitzgerald will testify that Cashmere Bouquet *594 contained asbestos based on his sampling from three mines from the Val Chisone/Val Germanasca region. Further, plaintiffs assert that as early as 1914 a geological survey of North Carolina mines documented asbestos contamination. Asbestos contamination, plaintiffs assert, was also revealed in a 1979 Montana Bureau of Mines geological survey. Plaintiffs cite a 1984 Montana study by Cyprus Mines Corporation finding that beginning in 1979 fibrous tremolite asbestos existed along 80% of the ore body in quantities up to 20%. Despite Colgate’s claim that its product was asbestos-free, plaintiffs point to Colgate’s own tests on Cashmere Bouquet and the 1974 finding by McCrone Associates that chrysotile was found in the three samples sent by Colgate for testing. That same year, McCrone Associates found tremolite in one of three samples sent by Colgate for testing. Plaintiffs point to a 1984 letter from McCrone Associates to Colgate disclosing the finding of chrysotile in three of six talc samples. Moreover, plaintiffs point to a 1972 study by Professor Seymour Lewin finding 2% chrysotile in Cashmere Bouquet sample 81. Plaintiffs cite Professor Langer’s 1976 study finding 20% asbestos quantity in Cashmere Bouquet, which prompted Colgate to sample Professor Langer’s batch, confirming the presence of anthophyllite, possible tremolite and other amphiboles. Plaintiffs also maintain that Colgate’s 2011 analysis report confirmed anthophyllite contamination in Cashmere Bouquet. Citing the deposition testimony of Joseph Simko and Salvatore DeSalva, plaintiffs assert that Colgate never informed the FDA of these findings.
Plaintiffs further note that Mrs. Feinberg used Cashmere Bouquet from 1950 until the 1980s after she took a shower (once or twice a day) (June 2, 2011 tr at 41, 42-44, 46, 56; May 25, 2011 tr at 119, 133-134, 173-174). Her youngest son, Jay Feinberg, testified that in his parents’ bathroom, the powder “was everywhere” and was “on the floor and on the tile, sides of the walls, on the countertop” (Oct. 11, 2011 tr at 84). Plaintiffs point out that her son Edward saw her use Cashmere Bouquet (Oct. 12, 2011 tr at 75).
Defendant’s argument is unpersuasive because it is not plaintiffs’ burden on summary judgment to prove that exposure to Cashmere Bouquet was a substantial factor in causing Mrs. Feinberg’s disease. Colgate has failed to meet its burden to *595 demonstrate that Cashmere Bouquet “could not have contributed to the causation of plaintiffs injury” (Matter of New York City Asbestos Litig., 122 AD3d 520, 521 [1st Dept 2014]; Matter of New York City Asbestos Litig., 123 AD3d 498 [1st Dept 2014]; Reid v Georgia-Pacific Corp., 212 AD2d 462, 463 [1st Dept 1995]). The fact that some talc might be asbestos-free does not eliminate the possibility that plaintiff was exposed to defendant’s asbestos-containing product (see Matter of New York City Asbestos Litig., 122 AD3d at 521 [“Although the record shows that defendant began to manufacture and ship asbestos-free joint compound around the time that plaintiff purchased defendant’s product, issues of fact exist as to whether asbestos-free joint compound was available in Manhattan where plaintiff made his purchase of the subject product”]; see also Berkowitz v A.C. & S., Inc., 288 AD2d 148 [1st Dept 2001] [issue of fact raised by defendants’ admission that products sometimes used asbestos]; Kestenbaum v Durez Corp., 2013 NY Slip Op 33497[U] [Sup Ct, NY County 2013] [rejecting Union Carbide’s argument that it was entitled to summary judgment because Union Carbide made an asbestos-free resin product], affd sub nom. Matter of New York City Asbestos Litig., 116 AD3d 545 [1st Dept 2014]). Colgate’s argument is premised on its conclusion that its product did not contain asbestos, or sufficient amounts of asbestos, to cause harm. However, the evidence is conflicting on this issue which raises issues of fact for the jury.
IV. General and Specific Causation
Colgate asserts that plaintiffs cannot show general or specific causation under Parker v Mobil Oil Corp. (7 NY3d 434 [2006]) and Cornell v 360 W. 51st St. Realty, LLC (22 NY3d 762 [2014]). Colgate contends that general causation is lacking because there is no study which connects talc with mesothelioma.[8] Colgate maintains that there is no specific causation because plaintiffs’ experts do not present a scientific expression of Mrs. Feinberg’s exposure to asbestos in *596 Cashmere Bouquet. Additionally, defendant asserts that the presence of visible dust from Cashmere Bouquet does not equate to evidence of hazardous levels of asbestos, because talcum powder always produces dust even when asbestos-free.
Plaintiffs maintain that defendant is attempting to re-litigate expert evidentiary issues that were already decided by Justice Shulman. Plaintiffs note that Justice Shulman stated on the record on July 24, 2012 that general causation was not being disputed. Additionally, Justice Shulman denied defendant’s motion in limine to exclude plaintiffs’ witnesses.[9] In denying the motion, plaintiffs point to the Justice’s statement that “a jury will have to weigh the evidence the parties are expected to present to decide whether C-P’s consumer talc product was in fact contaminated with amphibole asbestos in sufficient quantity to have been a substantial factor in causing decedent-plaintiff Feinberg’s mesothelioma” (exhibit 1, Horn affirmation).
Even if Justice Shulman’s decision did not foreclose the issue, plaintiffs maintain that they will provide a scientific expression that defendant’s product contained asbestos, and that asbestos was a substantial factor in causing mesothe-lioma. Unlike the benzine contained in gasoline at issue in Parker, plaintiffs observe that the connection between asbestos dust and mesothelioma is well-known (providing the basis for general causation). Their experts should not be precluded under Parker (7 NY3d 434) in light of the evidence of persistent, visible dust. Parker’s holding regarding specific causation did not challenge, nor would it change, the numerous First Department decisions upholding jury verdicts based on expert causation testimony of regular exposure to asbestos dust, such as in Lustenring v AC&S, Inc. (13 AD3d 69 [1st Dept 2004]) and Matter of New York Asbestos Litig. (28 AD3d 255 [1st Dept 2006]).
Colgate is foreclosed from arguing that plaintiffs’ experts (Sean Fitzgerald and Drs. Moline and Strauchen) should be precluded on summary judgment, because Justice Shulman already decided this issue in his January 8, 2016 decision. In reply, Colgate did not address this point. While counsel ad *597 dressed the issue at oral argument, the argument was unpersuasive.[10] On January 8, 2016, on reargument, Justice Shul-man upheld his March 28, 2014 bench ruling rejecting Colgate’s motion to preclude plaintiffs’ expert Sean Fitzgerald or alternatively for a Frye hearing to reject his methodology. Justice Shulman also denied defendant’s motion in limine to preclude plaintiffs’ medical causation witnesses Drs. Moline and Strauchen. In rejecting the motion he reasoned that “a jury will have to weigh the evidence the parties are expected to present to decide whether C-P’s consumer talc product was in fact contaminated with amphibole asbestos in sufficient quantity to have been a substantial factor in causing decedent-plaintiff Feinberg’s mesothelioma” (exhibit 1, Horn affirmation). I cannot review Justice Shulman’s ruling under the guise that this is a motion for summary judgment, and not a motion in limine, when Justice Shulman already found that the experts’ testimony was sufficient to be presented to the jury.[11]
Accordingly, it is hereby ordered that Colgate’s motion for summary judgment is denied in its entirety.

. In Schmidt v Merchants Despatch Transp. Co. (270 NY 287 [1936]), the Court of Appeals held that a cause of action arising out of an illness caused by inhalation of toxic dust accrues on the date the plaintiff is exposed to the dust — i.e., on the date plaintiff inhales it. The Court reasoned that initial inhalation causes actual physical damage to the body, which leads to the condition of which plaintiff complains, even though that condition may not fully manifest itself until many years later.

. The Court never stated that a sophisticated doctor’s diagnosis is ir-revelant to the determination of whether a plaintiff discovered, or should have discovered, the injury. The Court’s comment was based on the inverse proposition — i.e., that a doctor’s misdiagnosis or a plaintiff’s failure to discover the primary symptoms is not relevant to (i.e., does not forestall) the commencement of the statute of limitations.

. This act III, scene 1 quote from Shakespeare’s Hamlet is apropos to this discussion.

. In the same year as Wetherill, the Court decided Whitney v Quaker Chem. Corp. (90 NY2d 845 [1997]). In that case, plaintiff’s action was time-barred because he was “aware of the primary condition for which damages are sought” more than four years after (1) he made repeated trips to a local hospital and a center; (2) the doctors’ reports reflected a diagnosis that coolant exposure caused plaintiff’s illness; (3) plaintiff told an attending nurse that “the coolant is killing me”; and (4) plaintiff filed a workers’ compensation claim and Employer’s Report of Injury/Illness forms, outlining the same symptoms and stating that the coolant exposure was at fault (id. at 847).

. Second Department cases do not discuss the factors which are helpful in deciding where the threshold lies.

. Defendant claims that plaintiffs’ delay in bringing suit has compromised its ability to mount a defense. Colgate argues that it “took Mrs. Feinberg’s deposition shortly after this lawsuit was filed. By that time, May of 2011, Mrs. Feinberg failed to recall key facts, rendering potentially important evidence unavailable” (mem of law at 7). Plaintiffs counter that the lawsuit was timely filed and that Mrs. Feinberg gave clear testimony. Defendant’s argument is misplaced. A jury might not agree that the cited examples demonstrate that Mrs. Feinberg’s memory was faded, or if it was, that either Mrs. or Mr. Feinberg (who was deposed) would have had a better memory had the action been filed earlier given that questions related to facts occurring many decades ago. In any event, if the action is untimely, Colgate’s argument is superfluous.

. In design defect cases, plaintiff may prove his or her cause of action by circumstantial evidence (see Ramos v Howard Indus., Inc., 10 NY3d 218 [2008]).

. Colgate does not cite Matter of New York City Asbestos Litig. (99 AD3d 410, 410 [1st Dept 2012]) which affirmed Justice Shulman’s consolidation ruling and rejected Colgate’s prejudice argument because Mrs. Feinberg’s case, and two others, did “not present a novel scientific theory. Indeed, that a link has not yet been established between consumer talcum powder and mesothelioma-causing asbestos does not render plaintiffs’ theory an immature tort, particularly where the link has been established in the use of industrial talc.”

. Justice Shulman issued a decision dated January 26, 2016 which stated that the motions were decided in accordance with a January 8, 2016 decision filed under Bernard v Brookfield Props. Corp. (index No. 190078/08). The January 8, 2016 decision is attached as exhibit 1 to the Horn affirmation.

. At oral argument, Colgate’s counsel maintained that Justice Shul-man’s decision does not address “the argument we are making here on summary judgment, which is to say that Dr. Stauchen and Dr. Moline have both testified that they do not have any basis to testify to the level of exposure that Mrs. Feinberg allegedly received from the particular containers she used” (May 17, 2016 tr at 46). Colgate’s counsel also argued that there “is no indication there as to the basis for that ruling as to whether Justice Shul-man was considering this question of whether or not Dr. Strauchen or Dr. Moline could testify to the amount or level of asbestos that was purportedly in the particular containers that Mrs. Feinberg used” (id. at 45).

. While I will not revisit Justice Shulman’s decision, I would like to note that the Parker Court acknowledges that “often, a plaintiff’s exposure to a toxin will be difficult or impossible to quantify by pinpointing an exact numerical value” (7 NY3d at 447). Therefore, “it is not always necessary for a plaintiff to quantify exposure levels precisely or use the dose-response relationship, provided that whatever methods an expert uses to establish causation are generally accepted in the scientific community” (id. at 448). Parker also states that the intensity of the exposure may be more important than the cumulative dose, and plaintiff’s work history can be considered in order to estimate the exposure (id. at 449).